**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**
Plaintiff,

*v.*

**TRISTIN ALLEN FETTERS,**
Defendant.

Case No. 5:26-CR-40003-AWM-2

**MEMORANDUM AND ORDER**

Tristin Fetters said no to Topeka Police Detective Jason Dunderdale—for about fifteen seconds.

Dunderdale had come to the Shawnee County Courthouse for Fetters's cell phone. He suspected the phone would show who Fetters had been talking to while a man robbed the liquor store where Fetters stood. When Dunderdale asked for it, Fetters told him to get a warrant. Then he thought better of it. "You can have this," he said, holding up the phone. "I don't care about that. I just don't want to be late."

Over the next half hour, Fetters agreed again while he met with his probation officer, then he carried the phone out of the courthouse in his own pocket, after which he rode to the police station in a friend's truck. There, he rolled down the window and handed the phone over. Later, when Dunderdale called to ask for the passcode, Fetters gave him that, too.

Fetters now asks the Court to suppress everything found on the phone. Doc. 37. He argues that his consent was really submission: a detective announced he was taking the phone no matter what, in places no reasonable person would feel free to leave. Some of those points have merit, and parts of this encounter did put pressure on Fetters. But the body-camera video shows that his will was not overborne. For most of the morning,

what worried him was being late. The Government has proven that Fetters voluntarily consented to both the seizure and the search of his phone, so the motion is **DENIED**.

## I. BACKGROUND

### A. The robbery

At about 10:40 p.m. on December 5, 2025, a man in a distinctive hoodie walked into K&K Liquor in Topeka, threatened the clerk, ripped the drawer out of the cash register, and ran. Doc. 37 at 2; Doc. 45 at 2. He got away with $391. Doc. 45 at 2. Fetters was the only other person in the store. *Id.* at 3; *see* Doc. 37 at 2.

Topeka police officers questioned Fetters that night. Doc. 37 at 3; Doc. 45 at 3. Detective Dunderdale came to believe that Fetters knew more than he was saying, and that he may have been on the phone with the robber while the robbery happened. Doc. 37 at 3; Doc. 45 at 3. Dunderdale learned that Fetters was on state probation, so he called Fetters's supervising officer, Ashley Cartmill. She told him that Fetters had a mandatory meeting with her at the Shawnee County Courthouse at 9:00 a.m. on December 12. Doc. 37 at 3.

### B. "Do you want to play the game?"

Dunderdale was waiting when Fetters arrived that morning. He introduced himself and asked for the phone. Doc. 37 at 3; Doc. 45 at 3. When Fetters asked why, Dunderdale told him: "I'm going to get a search warrant to download it. I want to know who you were talking to Friday night before that robbery." Gov. Ex. 1 at 9:08:25.

Fetters said: "Okay. When you get your warrant you can have it." *Id.* at 9:08:30.

Dunderdale explained that he needed to secure the phone so nothing on it would be deleted in the meantime. Then he asked, "Do you want to play the game?" *Id.* at 9:08:35–45. Fetters responded within seconds, and his concern was being late. "I'm just trying to go see my P.O. real quick. You can have this," he said, gesturing with the phone. "I don't care about that. I just don't want to be late." *Id.* at 9:08:45–54.

"Let's go," Dunderdale said. He followed Fetters to a Court Services waiting room upstairs, into an elevator, and then to a second waiting room downstairs. *Id.* at 9:08–9:11; Doc. 37 at 4–5. In the elevator, he told Fetters he did not believe Fetters's claim that he didn't know the robber. Doc. 37 at 4. In the waiting rooms, Dunderdale stood and watched. Doc. 37 at 5; Doc. 45 at 4. Fetters kept his phone and used it while he waited, holding it where Dunderdale could see it and assuring him that he wasn't deleting anything. Doc. 37 at 5.

**C. The probation office**

When Cartmill came out to the waiting room, Dunderdale told her he was not letting Fetters's phone out of his sight. She invited both men back to her office. Gov. Ex. 1 at 9:18:21–33. There, Dunderdale told Fetters plainly that he believed Fetters was involved in the robbery and possibly others, and that he intended to secure the phone and get a warrant to download it. *Id.* at 9:19:05–55. He also told Fetters: "It's your right to make me get a warrant before I do a download [of] the phone." Gov. Ex. 1 at 9:19:58–9:20:02.

Fetters answered that he had nothing to hide. Gov. Ex. 1 at 9:20:01–05. Dunderdale said it would save time if Fetters simply consented, and that Fetters could

wait while the phone was downloaded. Gov. Ex. 1 at 9:20:05-9:20:50. Fetters was not happy about any of it: "You're just really . . . pissing me off." Gov. Ex. 1 at 9:22:38–41.

Cartmill then spoke up. She told Fetters that he was not "in trouble with me as of right now," and she described cooperating with the detective as one of the "steps to saying, 'Hey. I'm doing what I need to do to get on the right track.'" *Id.* at 9:23:40–58. Fetters asked how long the download would take. Hours, Dunderdale said. *Id.* at 9:20:20–23. Fetters agreed that Dunderdale could have the phone. *Id.* at 9:25:02–06. "I appreciate that," Cartmill said. "That way, we're not looking at something else too." *Id.* at 9:25:03–10.

**D. The parking lot**

Fetters did not hand over the phone in Cartmill's office. He kept it. Dunderdale asked Fetters if he wanted to ride with him or with his friend, and Fetters responded that he would ride with his friend. *Id.* at 9:26:10–16. Dunderdale walked out of the courthouse with him and told him to keep the phone in his pocket until they got there because "I can tell if stuff's been deleted." *Id.* at 9:27:11–20. In the parking lot, Fetters put the phone in his vest pocket ("Look, it's going in my pocket") and got into his friend's truck. *Id.* at 9:28:14–16. The friend drove a few blocks to the Law Enforcement Center, and Dunderdale followed in his own car. *Id.* at 7; Doc. 45 at 4.

When Dunderdale walked up to the truck, Fetters rolled down the passenger window and handed him the phone. Gov. Ex. 2 at 09:38:15–23. He said he couldn't stay for the download because he had a job interview to get to. Dunderdale asked how to get a hold of him and if he could contact Fetters's friend in the driver seat. *Id.* at 9:38:20–

35. Fetters and his friend both agreed, and Dunderdale took down the friend's number. *Id.* at 09:38:22–53.

Then, with the phone already in hand, Dunderdale asked once more: "Am I doing this with your permission, or are you going to make me go get a warrant?" *Id.* at 09:38:58–39:02. Fetters answered, "You can just [unintelligible]." *Id.* at 09:39:01–02. Fetters claims he said, "go get a warrant." Doc. 37 at 7, 16. The Government says Fetters confirmed he was handing over the phone without the need for one. Doc. 45 at 5. The recording doesn't settle it, although Dunderdale testified Fetters said, "you can search it." Hr'g Tr. 36:15–17. What comes next on the recording is clearer. When Dunderdale said he hoped the download would clear Fetters, Fetters said, "Me too," and he nodded when Dunderdale thanked him for cooperating. Gov. Ex. 2. at 9:39:05–17.

**E. The passcode and the charges**

The phone turned out to be powered off and locked. Doc. 37 at 7; Doc. 45 at 5. Dunderdale called Fetters's friend and asked for the passcode. Hr'g Tr. 25:19–22. He heard the friend repeat the question to Fetters, and then heard the friend repeat back the answer. Hr'g Tr. 26:2–3. Fetters had given him the code. Hr'g Tr. 26:2–6. Doc. 45 at 5. Dunderdale described this exchange at the October 8, 2026 hearing, and the Court credits his testimony.

The download showed that Fetters had been on the phone during the robbery with a contact saved as "Joe Blow," who was later identified as Joseph Bryant Toole, III. Doc. 1-1. A grand jury indicted both men on one count of Hobbs Act robbery. Doc. 1. Fetters moved to suppress, Doc. 37; the Government responded, Doc. 45; and Fetters replied, Doc. 46. At the October 8 hearing, Dunderdale testified, and the Government

introduced body-camera video of the courthouse encounter (Gov. Ex. 1) and the parking lot handoff (Gov. Ex. 2).

## II. LEGAL STANDARD

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. A search or seizure without a warrant is per se unreasonable unless it falls within one of a few established exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent is one of them. *Id.*

A defendant challenging a warrantless seizure must first show that one occurred, meaning the government meaningfully interfered with his possessory interest in property. *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018). That part is not in dispute here. The Government concedes that Dunderdale seized and searched Fetters's phone without a warrant, and it does not challenge Fetters's standing. Doc. 45 at 5. So the burden shifts to the Government to prove, by a preponderance of the evidence, that Fetters voluntarily consented. *Schneckloth*, 412 U.S. at 222; *United States v. Reyes-Montes*, 233 F. Supp. 2d 1326, 1330 (D. Kan. 2002). That burden has two parts. The Government must offer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given," and it must prove "that this consent was given without implied or express duress or coercion." *United States v. Yates*, 479 F. Supp. 2d 1212, 1215 (D. Kan. 2007) (quoting *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996)).

The test for voluntariness is whether the defendant's will was overborne. *Schneckloth*, 412 U.S. at 225–26. No single factor decides that question. The Court weighs the totality of the circumstances. *Id.* at 226–27. The Tenth Circuit has listed the

considerations that matter most: "physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons." *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006). So do whether the officer read the defendant his *Miranda* rights, whether the officer obtained consent "pursuant to a claim of lawful authority," and whether the officer told the defendant he could refuse. *Id.* A defendant's knowledge that he may refuse is relevant, but the Government need not prove it. *Schneckloth*, 412 U.S. at 226–27.

## III. ANALYSIS

Fetters makes two arguments. First, he argues that whatever he said about the phone was submission, not consent. Second, he argues that even if he let Dunderdale take the phone, he never let him look inside it. The Court addresses each in turn, and is not persuaded by either.[1]

### A. Fetters voluntarily let Dunderdale take the phone.

#### 1. Fetters made his own choices about the phone.

This encounter was free from most of the usual signs of coercion. Nobody laid a hand on Fetters. Nobody threatened to arrest him, promised him anything, or tricked or deceived him. One officer was present, and his gun stayed in its holster. Nothing suggests that Fetters was impaired or confused. *See* Doc. 37 at 3, 9–13. Dunderdale was

---

[1] Because the Court finds that Fetters consented to both the seizure and the search, it does not reach the Government's alternative arguments based on exigent circumstances, inevitable discovery, or the search condition of Fetters's probation. *See* Doc. 45 at 11–12, 15–19; Doc. 46 at 6–12.

persistent, even pushy. “Do you want to play the game?” is not how anyone would want an officer to ask for consent. But persistence is not coercion, and Dunderdale’s tone never became a threat.

Fetters agreed to give up the phone three separate times: in the courthouse hallway, fifteen seconds after his initial refusal; in Cartmill’s office; and at the truck window. Each time, his stated worry was the clock. He didn’t want to be late for his probation meeting. He asked how long the download would take. He had a job interview. He wanted to know when he would get the phone back. Those are the concerns of someone fitting the detective’s request into a busy morning.

Just as important, Dunderdale did not take the phone at the courthouse. Fetters kept it for half an hour. He used it in the waiting room, carried it out of the building, and left in a vehicle the detective did not control. Fetters decided when and where to give it up, and at the Law Enforcement Center, he handed it over without being asked.

**2. Fetters’s counterarguments do not change the balance.**

*A claim of lawful authority*. Fetters’s strongest argument is that Dunderdale made the seizure sound inevitable. “I need the phone,” Dunderdale said, and “I’m not letting his phone out of my sight.” According to Fetters, anything he agreed to do after that was just acquiescence to a claim of lawful authority. Doc. 37 at 10–11; Doc. 46 at 6.

That legal premise is correct. Consent that amounts to “no more than acquiescence to a claim of lawful authority” is not consent at all. *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). In *Bumper*, the officers told a grandmother they had a warrant to search her house. *Id.* at 546. But here, Dunderdale claimed no warrant. He told Fetters the opposite: he didn’t have a warrant, he planned to get one, and Fetters had the right

to make him. Doc. 37 at 5. Telling a suspect what an officer intends to do if the suspect refuses is not inherently coercive. *United States v. Wheeler*, No. 17-40037-01-DDC, 2018 U.S. Dist. LEXIS 24030, at *38–39 (D. Kan. Feb. 14, 2018). And Dunderdale never followed through: the phone left the courthouse in Fetters's pocket and rode to the Law Enforcement Center in his friend's truck.

*The search-versus-seizure warning*. Fetters points out that Dunderdale told him he could refuse a search but never told him he could refuse a seizure. Doc. 37 at 10. That's true, and it counts in Fetters's favor. But the law does not require any such warning, *Schneckloth*, 412 U.S. at 227, and in this case, it would have told Fetters nothing he didn't already know. His very first answer was "When you get your warrant you can have it." Fetters cites that answer as proof that he resisted. Doc. 37 at 11. It is better proof that he knew he could refuse. Besides, the line between search and seizure would have meant little to Fetters that morning. Dunderdale said the only reason he wanted the phone was to download it. Fetters agreed to the download, and a phone can't be downloaded while it sits in its owner's pocket. Courts have recognized that consent to search an item ordinarily includes permission to hold it for as long as the search reasonably takes. *See United States v. Hephner*, 260 F. Supp. 2d 763, 772 (N.D. Iowa 2003). Fetters distinguishes *Hephner* because the driver there was free to object and didn't. Doc. 46 at 5–6. Fetters was free to object at the truck window, and he didn't either.

*No* Miranda *warnings and no consent form*. Neither is required. A consent to search is not a testimonial statement, so *Miranda* doesn't apply to it. *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993). And a written form is not "necessary . . . to insulate an otherwise knowing and voluntary oral consent against

attack." *United States v. Miles*, 16 F. App'x 845, 849 (10th Cir. 2001) (unpublished). Here, the Court has the body-camera video of the exchange, which shows what was said better than any other form could.

*The setting*. The courthouse is where Fetters's argument has the most merit. Fetters was a probationer at a mandatory meeting, and missing it would have had consequences. He rode in an elevator with an armed detective who accused him of a crime. In his probation officer's own office, the detective did the talking, and his probation officer told him that cooperating was a step toward getting "on the right track." A reasonable probationer could be intimidated by those circumstances. If the case turned only on what Fetters said in Cartmill's office, it would be closer.

Fetters's consent does not rest on that conversation alone. Whatever pressure the courthouse put on Fetters was gone by the time he handed over the phone. The probation meeting was over. Fetters was out of the building and sitting in his friend's truck, with the phone in his pocket and the detective standing in the parking lot. Nothing stopped him from telling his friend to drive somewhere else, or from leaving the window rolled up. He did neither. He rolled down the window, handed over the phone, and talked about his job interview. Then Dunderdale asked again whether he was acting with permission or would have to get a warrant. That question reminded Fetters that he could still refuse.[2]

Looking at the whole morning together, as the law requires, the Court finds Fetters's agreements at the courthouse voluntary, too. But the decisive moment came at

[2] Fetters also argues that he himself was seized because no reasonable person in his position would have felt free to end the encounter. Doc. 37 at 12–13. This claim simply isn't supported by the video. And even if it were, detention is just "one factor" in the voluntariness analysis, *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007), and the Court has weighed it. A detained person can still consent voluntarily, and for the reasons given above, Fetters did.

the truck window, where he had every chance to keep the phone. He chose to hand it over. The Government has proven that Fetters freely and voluntarily consented to the seizure of his phone.

**B. Fetters voluntarily let Dunderdale search the phone.**

Fetters's second argument rests on part of a garbled sentence. When Dunderdale asked whether he was acting with permission or would have to get a warrant, Fetters said, "You can just [unintelligible]." Fetters says he said "go get a warrant," and he adds that the question was too vague to support consent anyway, since Dunderdale never said what "this" meant. Doc. 37 at 15–17. He also points out that he had turned off his phone, which locked it. That act, he argues, is like refusing to hand over the key to a locked briefcase. *Id.* at 16–17 (citing *Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991)).

**1. The request was specific.**

The scope of consent is measured by "what . . . the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Jimeno*, 500 U.S. at 251; *United States v. Elliott*, 107 F.3d 810, 814–15 (10th Cir. 1997). The exchange that morning had been about one thing. Dunderdale said he wanted the phone to download it. He told Fetters he had the right to make him get a warrant "before I do a download." He suggested that consent would save time and that Fetters could wait while the phone was downloaded. And Fetters asked how long the download would take. No one standing at that truck window could have wondered what "this" meant.

**2. The context shows that Fetters consented.**

The Court cannot make out the last words of Fetters's answer on the recording. Dunderdale testified that Fetters said, "You can search it." Fetters says he said "go get a warrant," and on the recording alone, that reading is plausible.

First, the Court credits Dunderdale's testimony about the statement. Second, the answer doesn't stand alone, and its context supports Dunderdale's account. Just before it, Fetters had agreed to a download in Cartmill's office, worked out a plan for delivering the phone, carried out that plan, and gave Dunderdale his friend's phone number to call when the process was done. Someone who had just refused the download would have no reason to ask to be told when it was finished. Just after the answer, Fetters said "me too" when Dunderdale said he hoped the download would clear him, and he nodded when Dunderdale thanked him for cooperating. Neither response is consistent with a refusal.

**3. Fetters gave Dunderdale the passcode.**

Fetters's locked-briefcase argument assumes that he kept the key. He did not. When Dunderdale asked for the passcode, Fetters gave it to him. Whether Fetters turned off the phone on purpose doesn't matter. Giving the code was consent in its own right, and it is also the clearest evidence of what Fetters meant at the truck window.

**4. The consent was voluntary.**

The facts that show Fetters voluntarily consented to the seizure apply equally to the search, and some apply with greater force. By the time Fetters gave the code, he was even further from the courthouse than he had been at the truck window. He gave it over the phone, through his friend, with no officer anywhere near him. The Government has

proven by clear and positive evidence that Fetters unequivocally, specifically, and voluntarily consented to the search of his phone.

## IV. CONCLUSION

Fetters's first answer to Detective Dunderdale was "get a warrant." Had he stuck with it, this would be a different case. But he changed his mind within seconds, and afterward he confirmed that choice again and again: in the meeting with his probation officer, at the truck window, and on the phone when he gave up the code. The Fourth Amendment gave Fetters the right to refuse. He chose to consent instead, and he did so voluntarily.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 37) is **DENIED**.

Dated this 14th day of October, 2026, at Topeka, Kansas.

*s/ Anthony W. Mattivi*
Anthony W. Mattivi
United States District Judge